MHW

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VULCAN CONSTRUCTION MATERIALS, L.P., MIDWEST DIVISION, ) ) ) Plaintiff, ) ) v. ) ) INTERNATIONAL UNION OF ) OPERATING ENGINEERS, LOCAL UNION ) NO. 150, and MID-AMERICA REGIONAL ) BARGAINING ASSOCIATION, ) ) Defendants. ) | No. 09 C 1724<br><br>Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

Vulcan Construction Materials, L.P., Midwest Division ("Plaintiff") brings this action against International Union of Operating Engineers, Local Union No. 150 ("Local 150") and Mid-America Regional Bargaining Association ("MARBA"). (R. 1, Compl.) Pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("Section 301"), Plaintiff seeks a declaration that it lawfully repudiated and is not bound by any collective bargaining agreements ("CBAs") Local 150 and MARBA allege to be enforceable against it. (*Id.*) Presently before the Court are MARBA's (R. 27), Local 150's (R. 30), and Plaintiff's (R. 39) motions for summary judgment. For the reasons stated below, MARBA's motion is granted and Local 150's and Plaintiff's motions are denied.

## RELEVANT FACTS[1]

Plaintiff produces and sells various aggregates including stone, sand, and gravel that it mines from quarries, including a quarry located in McCook, Illinois (the "McCook Quarry"). (R. 32, Local 150's Facts ¶ 4.) Local 150 is a labor union that represents heavy equipment operators and other construction employees throughout northern Illinois, northwest Indiana, and eastern Iowa. (*Id.* ¶ 3.) Local 150 represents all of Plaintiff's equipment operators in northern Illinois. (R. 1, Compl. ¶ 9.) MARBA is a bargaining association composed of employer associations in the construction industry. (R. 29, MARBA's Facts ¶ 2.) MARBA negotiates and administers CBAs on behalf of its employer-members with Local 150 and other unions. (*Id.* ¶ 3.)

One such agreement, negotiated between Local 150 and MARBA, is the Heavy and Highway and Underground Agreement ("HHUA"). (*Id.* ¶ 4.) Local 150 alleges that the HHUA "obligates signatory employers to pay specified hourly wage and fringe benefit rates when their employees operate certain heavy equipment to perform construction work" anywhere in certain northern Illinois counties. (R. 32, Local 150's Facts ¶ 13.) The HHUA also contains procedures to be followed by the parties in the event a dispute arises. (R. 32, Ex. 1 at Art. XIII, § 1.) In Step One of this procedure, the grievance is to be taken up between a Local 150 representative and a designated representative of the employer. (*Id.*) If the grievance is not resolved within seven working days of the Step One conference, "it shall be reduced to writing and referred for conference and resolution by designated officials of the union and the [employer] at a pre-grievance hearing . . . ." (*Id.*) If the grievance remains unresolved, Step Three provides that the

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 Statements. (R. 29, MARBA's Local Rule 56.1 Statement of Uncontested Material Facts ("MARBA's Facts"); R. 32, Local 150's Local Rule 56.1 Statement of Uncontested Material Facts ("Local 150's Facts"); R. 41, Plaintiff's Local Rule 56.1 Statement of Uncontested Material Facts ("Pl.'s Facts").)

2

written grievance shall be filed within fifteen days to the Joint Grievance Committee ("JGC"). (*Id.*) The JGC consists of an equal number of members representing Local 150 and the employer. (*Id.*)

Although not a member of MARBA, Plaintiff purportedly adopted the HHUA in a Memorandum of Agreement with Local 150 dated May 26, 1981 (the "MOA").[2] (R. 29, MARBA's Facts ¶¶ 5,6; R. 1, Compl., Ex. A.) The MOA contains an "evergreen" or "automatic renewal" clause reading, "[t]his Agreement shall continue in effect from year to year thereafter and specifically adopt any Master Agreement entered into between [Local 150 and MARBA] subsequent to the expiration date of the Master Agreement herein adopted unless notice of termination or amendment is given in the manner provided herein." (R. 1, Compl., Ex. A.) With respect to termination, the MOA states that "[e]ither party desiring to amend or terminate . . . must notify the other in writing at least three (3) calendar months prior to the expiration of the Master Agreement adopted herein." (*Id.*)

Plaintiff is a member of the Northern Illinois Material Producers Association ("NIMPA"), employer association. (R. 41, Pl.'s Facts ¶ 6.) A CBA exists between Local 150 and NIMPA, which sets the terms and conditions of employment for heavy equipment operations in rock pits, quarries, and yards located in northern Illinois. (*Id.* ¶ 7; R. 32, Local 150's Facts ¶¶ 11, 39.) The current NIMPA Agreement is effective May 1, 2005, to April 30, 2010. (*Id.* ¶ 11.) It is undisputed that the material production work performed at the McCook Quarry is governed by the NIMPA agreement. (R. 51, Local 150's Resp. to Pl.'s Facts ¶ 15.)

---

[2] Plaintiff refutes that the MOA is a binding agreement to which it "is or ever was a party." (R. 37, Pl.'s Resp. to MARBA's Facts ¶ 6.) Further, Plaintiff alleges that none of its "current managers or representatives had ever seen or been aware of the existence of the MOA" prior to August 29, 2008. (*Id.*)

3

The Metropolitan Water Reclamation District ("MWRD") has been working on a project called the "Deep Tunnel Project," a series of construction projects designed to alleviate flooding in the greater Chicago area. (R. 32, Local 150's Facts ¶ 27.) Since the tunnels have proven insufficient to store all the rainwater produced, several limestone quarries have been converted into reservoirs that store rainwater until it can be treated and returned to Lake Michigan. (*Id.* ¶ 30.) On October 3, 2003, Plaintiff entered into an agreement with the MWRD to suspend its mining operations at the McCook Quarry and instead mine a site 2000 feet away known as the Lawndale Avenue Solids Management Area ("LASMA") in accordance with the Deep Tunnel Project. (R. 41, Pl's Facts ¶ 8.) The same employees who worked at Plaintiff's McCook Quarry have been and are now being employed at LASMA. (*Id.*) Plaintiff has continued to compensate its equipment operators at LASMA in accordance with the NIMPA Agreement. (*Id.*; R. 32, Local 150's Facts ¶ 41.)

Local 150 representative John Horn ("Horn") began investigation into the work Plaintiff was performing at LASMA due to inquiries by members regarding whether they would be paid under the HHUA instead of the NIMPA Agreement "since their work was no longer occurring in a pit, rock quarry, or yard." (*Id.* ¶ 41.) The base wage and fringe rates listed in the NIMPA Agreement were "substantially less than what prevailed for this type of work in Cook County." (*Id.* ¶ 49.) Horn first contacted the Indiana, Illinois, & Iowa Foundation for Fair Contracting ("IIIFFC") to investigate whether Plaintiff's payment of NIMPA wages at LASMA violated the Illinois Prevailing Wage Act ("IWPA"), 820 ILCS 130/1-12. (*Id.* at ¶ 44.) On or around July 22, 2008, the Illinois Department of Labor issued its opinion that, based on the information provided, the activities at LASMA were "covered work" under the IWPA and that employees performing such work "must be paid at the prevailing wage." (*Id.* at ¶ 53.)

4

Consequently, Local 150 formulated a grievance against Plaintiff, alleging that "[a]ll of the work described being performed at the MWRD reservoir construction site falls under the scope of work as defined by the [HHUA]" and that Plaintiff has failed to pay its members the prevailing wage as specified by the agreement. (*Id.* ¶¶ 37, 55.) Local 150 contacted Plaintiff's representative via telephone in accordance with Step One of the HHUA grievance procedure, but the parties were unable to resolve the grievance. (*Id.* at ¶ 54.)

On August 29, 2008, Local 150 alerted Plaintiff by letter that it had submitted a written grievance to a JGC for a pre-grievance hearing. (R. 41, Pl.'s Facts ¶ 11.) The hearing was held on September 23, 2008, without resolution. (*Id.* at ¶ 20; R. 32, Local 150's Facts ¶ 56.) By letter dated October 29, 2008, Plaintiff notified both Local 150 and MARBA that it was repudiating the MOA and HHUA effective immediately. (R. 41, Pl.'s Facts ¶ 21.) The letter further denied that the JGC "has any jurisdiction to hear or decide any allegations involving [Plaintiff's] alleged violation of any agreement and denie[d] that MARBA has any authority, jurisdiction, or right to represent [Plaintiff's] interests or participate in any proceeding concerning any relationship or dispute involving [Plaintiff] or its employees." (R. 42, Pl.'s App. to its Rule 56.1 Statement of Facts in Support of its Mot. for Summ. J. ("Pl.'s App."), Ex. B-2.)

On November 20, 2008, Local 150 responded that, notwithstanding the repudiation, Plaintiff remains a party to the HHUA and that Plaintiff's work for the MWRD is not covered by the NIMPA Agreement. (R. 32, Local 150's Facts ¶ 58; R. 41, Pl.'s Facts ¶ 22.) Local 150 also stated that it intended to "enforce all of its rights" against Plaintiff under the HHUA. (*Id.*) Plaintiff responded by letter on December 16, 2008, reiterating the statements made in the previous letter, including its repudiation of the HHUA. (R. 41, Pl.'s Facts ¶ 23.) Subsequently, Plaintiff was informed that the JGC would proceed with a scheduled hearing on January 28,

5

2009. (R. 32, Local 150's Facts ¶¶ 59, 60.) Plaintiff, however, did not appear for the hearing and the grievance was not resolved. (*Id.* at ¶ 61.) On March 11, 2009, the JGC's Secretary notified Plaintiff that the JGC would conduct a hearing concerning the grievance and that the JGC "may, by majority vote, reach a binding decision." (*Id.* ¶¶ 61-62; R. 41, Pl.'s Facts ¶ 27.)

## PROCEDURAL HISTORY

On March 19, 2009, Plaintiff filed a complaint with this Court pursuant to Section 301 requesting a judgment declaring that it had lawfully repudiated the MOA and the HHUA and that both are unenforceable and void as to it. (R. 1, Comp. ¶ 19-21.) Shortly thereafter, on May 11, 2009, Plaintiff filed an emergency motion for a temporary restraining order/temporary injunction to stay grievance proceedings. (R. 16, Pl.'s Emergency Mot.) The Court, however, denied this motion and the JGC hearing was held on May 13, 2009.[3] (R. 21, Minute Entry; R. 32, Local 150's Facts ¶ 63.)

On June 5, 2009, Local 150 moved for summary judgment, asserting that it is entitled to judgment as a matter of law because Plaintiff did not lawfully repudiate the HHUA, and furthermore, even if it did repudiate, Plaintiff's case is not ripe for adjudication until after the parties exhaust the proscribed grievance procedure. (R. 30, Local 150's Summ. J. Mot.; R. 31, Local 150's Mem. in Support of its Mot. For Summ. J. ("Local 150's Mem.") at 4, 8-10.) At the same time, MARBA moved for summary judgment, alleging that this Court does not have jurisdiction over the present action, Plaintiff lacks standing to sue MARBA and, in the alternative, that MARBA is protected by the doctrine of arbitral immunity. (R. 27, MARBA's

---

[3] On May 13, 2009, when the grievance came before the JGC, Plaintiff did not appear and the committee was unable to reach a binding decision. (R. 32, Local 150's Facts ¶ 63.) The MARBA representatives on the JGC did not participate in a vote because they could not reach consensus as to whether the grievance presented was governed by the HHUA, but the Local 150 representatives voted to uphold the grievance. (R. 41, Pl.'s Facts ¶ 29.)

Summ. J. Mot.; R. 28, MARBA's Mem. in Support of its Mot. for Summ. J. ("MARBA's Mem.") at 3-6.) Finally, on June 22, 2009, Plaintiff moved for summary judgment. (R. 39, Pl.'s Summ. J. Mot.) Plaintiff argues that neither the MOA nor the HHUA are enforceable as to it and that it is not subject to the HHUA grievance procedure.[4] (R. 40, Pl.'s Mem. in Support of its Mot. for Summ. J. ("Pl.'s Mem.") at 6-14.)

## LEGAL STANDARDS

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law." *Hampton v. Motor Ford Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In ruling on a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all doubts in favor of that party. *Keri v. Bd. of Trsts. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). On cross-motions for summary judgment, inferences are drawn in favor of the party against whom the motion under consideration was made. *First State Bank v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Once a moving party has met this burden, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The non-moving party must show that there is evidence upon which a

---

[4] In addition, Plaintiff again argues that it is entitled to injunctive relief to stay the grievance procedure. (R. 40, Pl.'s Mem. at 15-15.) This Court, however, has already decided this issue, and finds no reason to alter our decision now. (*See* R. 21, Minute Entry.)

7

jury reasonably could find for [it]." *Wheeler*, 539 F.3d at 634. The Court may consider any evidence that would be admissible at trial. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008). The evidence need not be admissible in form, but must be admissible in content. *Id.*

## ANALYSIS

### I. MARBA's Motion for Summary Judgment

#### A. Jurisdiction

The first issue the Court must address is whether it has jurisdiction. *See Buchel-Ruegsegger v. Buchel*, 576 F.3d 451, 453 (7th Cir. 2009) (stating that jurisdiction is a preliminary issue "because federal courts have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."). MARBA argues that Section 301 only applies to suits for "violations of contracts" and does not contemplate actions to declare a CBA void and unenforceable. (R. 28, MARBA's Mem. at 3-4.) Therefore, because Plaintiff has not alleged a violation of any contract, MARBA contends that subject matter jurisdiction in this Court is improper. (*Id.* at 4.)

Section 301 provides that, "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ." 29 U.S.C. § 185(a). The Supreme Court has instructed that a declaratory judgment plaintiff accused of violating a [CBA] may ask a court to declare the agreement invalid, and that in such cases, "the federal court's power to adjudicate the contract's validity is ancillary to, and not independent of, its power to adjudicate 'suits for violation of contracts.'" *Textron Lycoming Reciprocating Engine Div. v. UAW*, 523 U.S. 653, 658 (1998); *see also Stevens Const. Corp. v.*

8

*Chi. Reg'l Council of Carpenters*, 464 F.3d 682, 685 (7th Cir. 2006) (plaintiff seeking declaratory relief from an alleged violation of a CBA has filed a suit "for violation of contracts" within the meaning of Section 301 when the plaintiff seeks relief *in response* to an alleged violation.) (emphasis added); *J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers*, 398 F.3d 967, 973 (7th Cir. 2005) (same). In this case, Plaintiff brought the present action for declaratory relief that the HHUA is invalid based on Local 150's assertion that it violated the agreement by failing to pay its members the prevailing wage. (*See* R. 1, Compl.) Accordingly, Plaintiff's suit is based on a "violation of contracts," and this Court's subject matter jurisdiction is proper.[5]

MARBA further argues that this Court does not have jurisdiction over it because the organization is neither an "employer" nor a "labor organization" within the meaning of Section 301. (R. 28, MARBA's Mem. at 3.) "Labor organization" is defined as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5). The Seventh Circuit interprets this definition "very broadly." *Electromation v. N.L.R.B.*, 35 F.3d 1148, 1159 (7th Cir. 1994). "The 'broad definition' includes trade councils that engage in a variety of interactions with employers regarding wages, benefits,

---

[5] Further, the present situation is distinguishable from *Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm. v. Troha*, 328 F.3d 325 (7th Cir. 2003), the case on which MARBA relies. (*See* R. 28, MARBA's Mem. at 4.) *Teamsters* involved a union plaintiff that sought declaratory relief to enforce an arbitration subpoena against non-signatories to a CBA. *Id.* at 327. The Seventh Circuit concluded that the action did not fall under Section 301 because the union could not "possibly allege that a non-party violated a CBA," and therefore the case did not involve a violation of contracts and the plaintiff could not assert jurisdiction under Section 301. *Id.* at 329. In contrast, the present action is between actual parties to the CBA, and thus *Troha* is not controlling.

9

job security, and working conditions of its members' employees." *Sullivan v. Maverick Pools, Inc.*, No. 00 C 4381, 2001 WL 185514, at *2 (N.D. Ill. Feb. 26, 2001). MARBA defines itself as an association composed of a number of trade associations representing employers in the construction industry that serves its "constituent associations by negotiating and administering [CBAs], providing continuing education for contracts, and promoting and maintaining labor relations in the construction industry." (R. 29, MARBA's Facts ¶ 2.) Hence, by its own description, MARBA plays an important role in dealing with trade associations representing employers under the Labor Management Relations Act ("LMRA"). This Court therefore finds that MARBA is a "labor organization" within the meaning of Section 301.

### B. Standing

Next, MARBA argues that Plaintiff does not have standing to sue because no case or controversy exists between the parties. (R. 28, MARBA's Mem. at 4.) The doctrine of standing arises from the case-or-controversy requirement of Article III. *Pollack v. United States DOJ*, 577 F.3d 736, 738-39 (7th Cir. 2009). To establish standing, a plaintiff must show: (1) that he is under threat of suffering an "injury in fact"; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that a favorable decision will prevent or redress the injury. *Id.* at 739 (citations omitted). Plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. *Id.*

First, to satisfy the injury in fact requirement, Plaintiff must show that it has sustained or is in immediate danger of sustaining an injury that is "concrete and particularized." *Id.* "[T]he threat must be actual and imminent, not conjectural or hypothetical." *Id.* In this case, Plaintiff has shown that it could suffer potential financial repercussions if found to be in violation of the HHUA; namely, it will have to pay its employees working at LASMA higher wages and

10

potentially pay a grievance amount for not complying with the HHUA wages during the duration of its work at LASMA. (*See generally* R. 1, Compl.) As such, the threat of injury is "actual and imminent," and Plaintiff has satisfied the first standing requirement.

Next, Plaintiff must establish a causal relationship such that the injury is fairly traceable to MARBA's challenged conduct. *Pollack*, 577 F.3d at 739. It is undisputed that MARBA negotiated with Local 150 to create the HHUA, sent Plaintiff notices about the hearing, and appointed half of the members of the JGC in accordance with the grievance filed against Plaintiff.[6] (R. 29, MARBA's Facts ¶¶ 4, 9, 10.) Plaintiff argues that through these actions, MARBA has taken positive steps to subject Plaintiff to the HHUA and therefore a case or controversy exists. (R. 36, Pl.'s Opp'n to Def. [MARBA's] Mot. for Summ. J. ("Pl.'s MARBA Resp.") at 8-10.)

The Court finds, however, that MARBA's actions did not give rise to Plaintiff's injury. Rather, Plaintiff's injury is caused by the actions taken by Local 150 in investigating, formulating, and filing its grievance. MARBA has only complied with its administrative duties as laid out by the HHUA. (*See* R. 29, MARBA's Facts ¶¶ 9, 10.) MARBA acknowledges that Plaintiff is not a member of MARBA and does not claim to represent Plaintiff in CBA negotiations. (*Id.* ¶ 5.) Plaintiff has provided no evidence that MARBA would have pursued the grievance on its own volition nor that it had any part in the formation of the grievance at issue in this case. As such, Plaintiff's injury is not fairly traceable to MARBA's challenged conduct. *See DH2, Inc. v. United States SEC*, 422 F.3d 591, 597 (7th Cir. 2005) (determining that plaintiff had not met the burden of establishing the causation element for standing because the conduct

---

[6] MARBA members appointed to the JGC did not participate in a vote because they could not reach consensus as to whether the grievance presented was governed by the HHUA. (R. 41, Pl.'s Facts ¶ 29.)

11

complained of "hinge[d] on the decisions of independent actors," not the defendant.).
Accordingly, Plaintiff has failed to establish the Article III standing requirements with regard to MARBA and summary judgment is appropriately granted in MARBA's favor.

## II. Plaintiff & Local 150's Motions for Summary Judgment

Plaintiff and Local 150 filed cross-motions for summary judgment on the issue of whether the MOA and HHUA are enforceable. (*See* R. 30, Local 150's Summ.; R. 39, Pl.'s Summ. J. Mot.) Local 150 asserts that it is entitled to judgment as a matter of law because Plaintiff did not lawfully repudiate the HHUA, and even if it did repudiate, the case is not ripe for adjudication until after the parties exhaust the proscribed grievance procedure. (R. 31, Local 150's Mem. at 4, 8-10.) Plaintiff, on the other hand, contends that neither the MOA nor the HHUA are enforceable and it is not subject to the HHUA grievance procedure. (R. 40, Pl.'s Mem.)

### A. Whether the MOA is Admissible

Plaintiff first claims that Local 150 has not "fulfilled the requirements" to authenticate the MOA, arguing that it "has not produced the original document purporting to be the MOA so as to allow an inspection . . . ." (*Id.* at 6.) However, it was Plaintiff, not Local 150, that produced the MOA, by attaching it to its complaint. (*See* R. 1, Compl. Ex. A at 5.) Although a plaintiff is under no obligation to attach exhibits to the complaint, to the extent that it does, the exhibit "is a part thereof for all purposes." Fed. R. Civ. P. 10(c); *Witzke v. Femal*, 376 F.3d 744, 749 (7th Cir. 2004). Moreover, "[d]ocuments are authenticated by evidence sufficient to support a finding that the matter in question is what its proponents claim." *United States v. Osyp Firishchak*, 468 F.3d 1015, 1021 (7th Cir. 2006) (quotation omitted). Under Federal Rule of Evidence 908(b)(8), "ancient documents" are authenticated if the document is: (1) in such condition as to create no

12

suspicion concerning its authenticity; (2) in a place where it, if authentic, would likely be; and (3) in existence twenty years or more at the time it is offered. *Id.*; Fed. R. Evid. 901(b)(8). The MOA meets these requirements. It has been in existence for more than 20 years; it was found in the files of Local 150's Recording Secretary; and it was in the condition expected of an approximately 26-year-old document.[7] (R. 1, Compl., Ex. A; R. 32, Local 150's Facts ¶ 5.) Accordingly, the MOA is admissible at trial and therefore properly considered on this motion. *See Hardrick*, 522 F.3d at 761.

## B. Whether the Memorandum of Agreement Lapsed

Plaintiff next argues that the MOA and HHUA lapsed and became "null and void" years ago. (R. 40, Pl.'s Mem. at 7.) The MOA constitutes a pre-hire agreement governed by Section 8(f) of the National Labor Relations Act ("NLRA"), 9 U.S.C. § 158(f). A pre-hire agreement is made between a union and an employer before the workers to be covered by the contract have been hired by the employer or before the union has established majority status among the firm's employees. *Tri-Gen, Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1037 (7th Cir. 2006). While such agreements are generally illegal, Section 8(f) employs a statutory exception for the construction industry. *J.W. Peters, Inc.*, 398 F.3d at 969 n.1. Local 150 asserts that the current HHUA is enforceable against Plaintiff because the MOA contained an "evergreen" or "automatic renewal" clause which caused Plaintiff to adopt successor HHUAs, including the current one. (R. 31, Local 150's Mem. at 6-7.)

---

[7] Plaintiff's contention that the MOA was "smudge[d]" with "handwritten material and other markings superimposed over the printed materials" does not create suspicion regarding the document's authenticity. (R. 40, Pl.'s Mem. at 6.) The document was prepared on carbon paper more than 26 years ago, which the Court finds could reasonably cause these blemishes.

13

Plaintiff, however, argues that the automatic renewal clause is ineffective because the MOA became a nullity after Plaintiff did not hire any employees in accordance with the HHUA for a number of years. (R. 40, Pl.'s Mem. at 7.) For this contention, Plaintiff relies on *Chicago District Council of Carpenters Pension Fund v. Hunter Alliance Corp.*, No. 95 C 444, 1998 U.S. Dist. LEXIS 4396 (N.D. Ill. Mar. 30, 1998). In that case, the employer, Hunter Alliance Corporation ("Hunter"), executed an agreement in 1975 under which it agreed to be bound by the then-in-effect CBA between the union and MARBA. *Id.* at *2-3. The agreement, which contained an automatic renewal clause, also obligated Hunter to make contributions to certain funds. *Id.* at *3. Hunter made a number of payments to the funds at first, but stopped doing so in 1976 when it ceased operations. *Id.* Thirteen years later, the son of the original owner decided to "resurrect" Hunter, unaware of the 1975 CBA. *Id.* at *3-4. When the union filed an unfair labor practice charge against Hunter with the National Labor Relations Board ("NLRB") in 1994 claiming that Hunter had repudiated the 1975 agreement and unilaterally changed the terms and conditions of employment, the NLRB determined that the CBA had lapsed. *Id.* at *4-5. The NLRB emphasized that such a result was warranted due to the absence of bargaining unit employees and the lack of communication between the parties during the 16-year period from 1976-1994. *Id.* at *5-6. The district court likewise concluded that Hunter was not bound to the 1975 CBA. *Id.* at *12.

Generally, however, the Seventh Circuit routinely upholds the validity of automatic rollover clauses when the CBA includes clear termination clauses and the essential termination procedures have not been properly followed. *See, e.g., Office & Prof'l Employees Int'l Union, Local 95 v. Wood County Tel. Co.*, 408 F.3d 314, 315 (7th Cir. 2005) ("Allowing an agreement to persist is the point of an evergreen clause . . . ."); *Contempo Design, Inc. v. Chi. and Northeast*

14

*Ill. Dist. Council of Carpenters*, 226 F.3d 535, 546 (7th Cir. 2000) (determining that a union and employer were bound to a CBA that included an automatic renewal clause because terms of the termination clause were not correctly followed, stating that "[t]he terms of a [CBA] are to be enforced strictly when they are unambiguous."); *see also Cent. States v. Sara Lee Bakery Group, Inc.*, No. 07 C5880, 2009 U.S. Dist. LEXIS 89087, *41 (N.D. Ill. Sept. 28, 2009)("A contract containing an evergreen clause binds an employer to subsequent CBAs until the contract is properly terminated.") (citation omitted); *Cent. States v. Kabbes Trucking Co.*, No. 02 C 1809, 2004 U.S. Dist. LEXIS 23558, *53 (N.D. Ill. Sept. 28, 2009) ("Where 'clear and specific language' is used in the termination clause of a labor agreement, the federal courts are uniform in their strict interpretation of such language.") (citation omitted).

*Hunter* is distinguished from the aforementioned cases because the employer ceased operations and did not have any employees for a significant amount of time. *Hunter Alliance Corp.*, 1998 U.S. Dist. LEXIS 4396 at *10 ("the cause of the lapse was rooted in the long absence of bargaining unit employees."). A similar distinction does not exist in the case at hand, as Plaintiff does not allege that it ceased operations for any period of time. (*See* R. 1, Compl.) Therefore, the automatic renewal clause of the MOA, must be "strictly construed" binding Plaintiff until it terminates the agreement according to its terms. *Contempo Design*, 226 F.3d at 546. Accordingly, the Court finds that the MOA has not lapsed.

### C. Whether Plaintiff Effectively Repudiated

In support of its motion for summary judgment, Local 150 argues that Plaintiff's unilateral repudiation of the MOA was not effective. (R. 31, Local 150's Mem. at 8-9.) Generally, a signatory to a Section 8(f) pre-hire agreement "is bound to its terms for the duration of the agreement unless the employees covered by that agreement reject the signatory union in a

15

Board conducted election." *J.W. Peters, Inc.*, 398 F.3d at 973 (quoting *NLRB v. Bufco Corp.*, 899 F.2d 608, 610 (7th Cir. 1990). The Seventh Circuit, however, has recognized an exception to this general rule in situations involving bargaining units of one or no employees, deemed the "one-man unit" rule. *Id.* The "one-man unit" rule provides that "if an employer employs one or fewer unit employees on a permanent basis[,] the employer, without violating Section 8(a)(5) of the [NLRA], may withdraw recognition from a union, repudiate its contract with the union, or unilaterally change employee's terms and conditions of employment without affording a union an opportunity to bargain." *Id.* (quoting *Stack Elec., Inc.*, 290 NLRB 575, 577 (1988)); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663, 671 (7th Cir. 2005). The rule is based on the principle that "collective bargaining presupposes that there is more than one eligible person who desires to bargain." *Id.* (quoting *Stark Elec.*, 290 NLRB at 577).

In *J.W. Peters*, the employer was a signatory to a Section 8(f) pre-hire agreement for ironworkers between a union and a multi-employer bargaining unit. *J.W. Peters, Inc.*, 398 F.3d at 969. In 2002, the employer executed a compliance agreement with the union, which extended the terms of the existing pre-hire agreement (which was set to expire on May 31, 2003) through May 31, 2006. *Id.* This compliance agreement also contained an automatic renewal clause and termination procedure similar to that contained in the MOA in the present case.[8] *Id.* In 2004, the employer sent the union a letter repudiating the pre-hire agreement, explaining that it had not employed any ironworkers since 2003 and during the past two years had not employed any

---

[8] The automatic renewal clause in *J.W. Peters* read: "This Compliance Agreement shall remain in effect and shall be governed by Principal Agreements entered into in the future and covering future time periods unless and until it has been terminated by either party giving written notice of termination to the other at least four (4) months prior to the termination date of the applicable Principle Agreement in which event this Agreement shall terminate on the last day of the then applicable Principle Agreement." *Id.* at 969-70.

16

ironworkers for a period of more than 30 days. *Id.* at 970. The union replied that the pre-hire agreement remained in full force. *Id.* The Seventh Circuit applied the "one-man unit" rule in this instance, concluding that if the employer "in fact employed fewer than two employees during the relevant period" its unilateral repudiation of the contract "would, as a matter of law, relieve it of its contractual duty to arbitrate . . . ." *Id.* at 975. The Seventh Circuit stated that "it seems illogical to continue to bind [the employer] to a pre-hire agreement simply because it has no employees who could reject the Union as their bargaining representative in a Board-conducted election." *Id.*

On October 29, 2008, Plaintiff sent a letter to Local 150 and MARBA informing them that pursuant to the "one-man unit" rule, it was repudiating the MOA and HHUA "effective immediately." (R. 1, Compl. Ex. A, Oct. 29, 2008 Letter.) The "one-man unit" rule exception, however, only applies if the employer employed one or fewer bargaining unit employees at the time of repudiation. *J.W. Peters, Inc.*, 398 F.3d at 973. The number of workers employed under the HHUA at the time Plaintiff sent the October 29, 2008 letter, however, is in dispute. (*See* R. 40, Pl.'s Mem. at 11 ("[Local 150]'s contention that [Plaintiff] performed work subject to the HHUA in and after January, 2008 is, of course, hotly contested."); *see also* R. 50, Local 150's Resp. to Pl.'s Statement of Additional Facts ¶ 11.) This dispute is material because it will affect the outcome of the suit, therefore summary judgment is inappropriate at this stage. *See Hampton*, 561 F.3d at 713; Fed. R. Civ. P. 56(c). Similarly, the Court cannot reach the arbitration issue because whether the grievance is arbitrable hinges on the effect of Plaintiff's repudiation. If Plaintiff qualified for the "one-man unit" rule exception, the repudiation "would, as a matter of law, relieve it of its contractual obligation to arbitrate." *J.W. Peters*, 398 F.3d at

975. Thus, since the number of employees employed by Plaintiff under the HHUA is a disputed issue of material fact, summary judgment for both Plaintiff and Local 150 must be denied.[9]

## CONCLUSION

For the foregoing reasons, MARBA's motion for summary judgment (R. 27) is GRANTED. Local 150's (R. 30) and Plaintiff's (R. 39) motions for summary judgment are DENIED. The parties are directed to reevaluate their settlement positions in light of this opinion and exhaust all efforts to settle this case. A status hearing will be held on December 4, at 9:45 a.m. to set a firm litigation schedule for this case.

Entered:

Judge Ruben Castillo
United States District Court

Dated: November 25, 2009

---

[9] Although the issue was not put forth in the complaint, Plaintiff now asserts that the MOA was not "executed by a representative of Plaintiff having the authority to execute such an agreement on its behalf." (R. 40, Pl.'s Mem. at 6; see generally R. 1, Compl.) This issue also creates a factual dispute, sufficient to bar summary judgment. See Hampton, 561 F.3d at 713; Fed. R. Civ. P. 56(c).